No. 33,400

BEN H. FOSTER, *Appellee*, v. KANSAS GAS AND ELECTRIC COMPANY, *Appellant*.

(69 P. 2d 729)

Opinion filed July 10, 1937.

*Paul H. Kimball, Webster W. Kimball,* both of Parsons, *H. L. McCune, Blatchford Downing, Lynn Webb* and *Robert S. Eastin,* all of Kansas City, Mo., for the appellant.

*Payne H. Ratner, Stuart T. McAlister* and *Louise Mattox,* all of Parsons, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages to crops of plaintiff growing on farm land in the valley of the Neosho river, alleged to have resulted from excessive flood waters wrongfully diverted to plaintiff's land by fills and levees constructed in the valley by defendant. A jury trial resulted in a verdict and judgment for plaintiff for $626.12. Defendant has appealed.

The amount of the judgment is not seriously questioned if plaintiff is entitled to recover. While raised by demurrer to plaintiff's evidence, by instructions requested and by objections to instructions given, and various other requests or objections made in the course of the trial, the points argued by appellant may be grouped under two main contentions: (1) That the evidence is insufficient to sustain the verdict, and (2) that the trial court applied incorrect principles of law with respect to defendant's liability.

The facts, which may be said not to be controverted, may be stated as follows: The Neosho river is one of the principal rivers of the state and drains a large area by the time it reaches the location in Labette county, where this controversy arose. There, normally,

it flows in a well-defined channel, but at times of high water caused by rains or melting snow over its watershed it overflows the banks of the channel and the floodwaters of the river spread out over the bottomland along its course until the river in places is of a width of as much as two miles. These floodwaters flow along with the water in the normal channel of the river and return to it farther down the river. At the location where the controversy in this case arose the lowlands extend east from the normal river channel about 9,000 feet to the beginning of the higher land. All this area of low land, as well as similar land on the other side of the river, is subject to overflow by the floodwaters of the river. Such floods occur at irregular intervals of such frequency that they may be reasonably anticipated, and naturally some of them carry more water than others. Plaintiff owns, resides upon and farms 40 acres of land situated about a mile and a quarter east of the normal river channel, and farms about 40 acres of rented land three quarters of a mile north of his home. About a mile north and a mile west of plaintiff's home, and on the east bank of the normal river channel, defendant had constructed and was maintaining a large plant for generating electric energy, which it distributes over high lines to various places, for sale. Defendant's electric generating plant now represents an investment, we are told, of $5,000,000, and its fuel requirements are 350 tons of coal per day. At the location of its plant defendant had filled in with cinders, and perhaps other material, to a depth of five or six feet above the natural level of the ground, an area about 1,000 feet north and south by 1,400 feet east and west. This enabled defendant to have its plant proper above the flood waters of the river. Directly to the southeast of defendant's plant, when it was first installed, is what is spoken of as a horseshoe lake. Perhaps at some time this was a part of the old river channel, but if so, the ends had been filled in by deposits of earth so that what remained was a somewhat semicircular lake filled on occasions by overflowing flood waters. In operating its plant defendant uses large quantities of water from this lake to cool its engines. Sometime prior to 1927, in order to have ample water convenient for its needs, defendant enlarged the horseshoe lake by making it longer, wider and deeper. In doing this it constructed an earthen levee five to seven feet above the natural level of the ground around the enlarged lake, leaving substantial openings in the levee at the north and south ends of the lake. In what is spoken of as the flood of 1927 a great deal of the

overflow floodwaters of the river flowed into Horseshoe lake from the north, through the opening left in the levee, through Horseshoe lake and through a depression south of it known as Dry lake, and on south with the floodwaters of the river. About 1928 defendant repaired its levee around Horseshoe lake and filled in the openings previously left in the levee so that it then had a fill and levee from five to seven feet higher than the elevation of the land on which it was built and high enough to prevent all the floodwaters of any flood of the Neosho river, reasonably to be anticipated, from flowing over the land on which its plant was situated and from flowing into and across Horseshoe lake as enlarged. This fill and levee extended from the bank of the normal channel of the river eastward about 5,000 feet and to within about 1,300 feet of plaintiff's land.

Plaintiff's action was for damages to his crops in 1935 by the floodwaters of that year, his claim being that because of the fill and levee constructed and maintained by defendant the water upon his land was higher than it would have been and stayed longer than it otherwise would have remained, resulting in the damages he claimed. To support this there was evidence to the effect that the government river gauge at the nearest point on the river showed the waters to be higher by about half an inch at the time of the flood of 1927 than at the time of the flood of 1935, and the testimony was that the water on plaintiff's land was thirteen inches higher in 1935 than it was in 1927. Testimony was given also by several witnesses who had resided in or near this valley at this point for many years that prior to the time that any of defendant's improvements were made to its plant much of the overflow floodwaters of the river passed from the north to the south across the land later filled by defendant, and across Horseshoe lake, and continued south as a part of the floodwaters of the river, and that while water was sometimes on plaintiff's land, it was never so deep, nor so destructive to crops, as since the fill and levee were put in by defendant. Maps, with contour lines showing elevations of various parts of the valley, were in evidence as well as the opinion of experts.

Turning now to appellant's contention that the evidence was insufficient to sustain the verdict: Appellant argues this largely from the maps with contour lines showing elevations, and from some of the evidence of the expert witnesses. We have examined these maps, with all they show. They are too large and too much in detail to be reproduced satisfactorily here. The one made shortly before

defendant made any improvements in the valley supports rather than contradicts the evidence of plaintiff's witnesses to the effect that much of the floodwaters of the river naturally would pass over the land and lake later improved by defendant. The opinions of the experts were in conflict in some respects as to the effect upon the floodwaters of the fill and levee constructed by defendant. Some of this was to the effect that it would force the water which could not go across this 5,000 feet of the river valley, obstructed by the fill and levee, to go to the east and south thereof, increasing the depth of the water on plaintiff's land. This, together with the testimony that the floodwater on plaintiff's land actually was thirteen inches deeper than in 1927, and that it was this excessive floodwater which destroyed plaintiff's crops, was all before the jury. We think the effect upon the floodwaters of the fill and levee constructed and maintained by defendant was a fair question for the jury and trial court, and that it cannot be said as a matter of law that these things had no effect upon the depth of the water on plaintiff's land, or that the increased depth of the water had no destructive effect on plaintiff's crops.

With respect to the legal questions involved, the trial court followed the rulings of this court in *Clements v. Phoenix Utility Co.,* 119 Kan. 190, 237 Pac. 1062. That case concerned overflow floodwaters of the Neosho river at the same place in the river and its obstruction or diversion by the same electric generating plant involved in this case. The defendant in that case was the previous owner of the plant now owned by defendant here. The difference between that case and this one is that in that case damage was claimed to crops on the other side of the river from land owned by the plaintiff here, and the obstruction alleged to have diverted water was the grade of the railroad maintained by defendant to service its plant. There the defendant argued, as it does here, that the overflow floodwaters of the river became, in legal contemplation, surface waters, and that anyone may obstruct against them without being liable in damages to his neighbor. That question was fully considered, and in harmony with previous decisions of this court it was held:

"Water which overflows the banks of a river at the time of an ordinary freshet or overflow and then flows over the lowlands or valley with the general course of the current of the stream, returning to the stream or its outlet farther down its course, is deemed a part of the water of the stream."

Other rulings in harmony with this were also stated. In this case appellant has asked us to review that doctrine, and in effect asks us to overrule that case and to hold that floodwaters which overflow the normal channel of a stream become surface water, which may be diverted against or obstructed by any landowner without being liable for damages to neighboring lands or crops caused thereby. Appellant in this case cites all the authorities tending to support that view which were cited by appellant and considered by the court in the Clements case, also a few decided since that time. In view of appellant's argument we have again reëxamined the question and adhere to the rules announced in the Clements case. There is no necessity of restating in full the arguments and conclusions in that case, neither is it necessary to write a new treatise on the subject.

We find no material error in the record. The judgment of the court below is affirmed.